### McCONNELL et al. v. CHELTON TRUST CO.

(Circuit Court of Appeals, Third Circuit. June 29, 1922.)

#### No. 2804.

Fixtures ⟨KEY⟩18(5)—Machinery put in mortgaged plant by purchaser of plant at judicial sale held not subject to lien in Pennsylvania.

Where, after judicial sale of a mortgaged plant for manufacturing printing presses, a business proved unprofitable for the location, the purchaser installed therein machines for manufacture of war munitions, and later machines for the manufacture of silk machinery, such added machines did not become subject to the mortgage lien, continued unaffected by the judicial sale, by Act Pa. May 8, 1901, § 1 (P. L. 141; Pa. St. 1920, § 8853), they being installed, so that they could be removed without damage to the factory, no intent that they should become part of the printing machinery outfit appearing or being inferable, and the machinery for printing presses remaining intact and in good condition.

Woolley, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Middle District of Pennsylvania; Charles B. Witmer, Judge.

Petition by William C. McConnell and another, receivers of the Lehigh Machine Company, for leave to remove and sell certain machinery, opposed by the intervener, the Chelton Trust Company. From an adverse decree, petitioners appeal. Reversed.

Ralph B. Evans, of Philadelphia, Pa., and Jacob C. Loose, of Mauch Chunk, Pa., for appellants.

W. G. Thomas, of Mauch Chunk, Pa., George E. Gray, of Lehighton, Pa., and Freyman, Thomas & Branch, of Mauch Chunk, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This case concerns the sale of certain machinery in a factory belonging to the Lehigh Machine Com-

pany and situate in the borough of Lehighton, Pa. The court below, in which was the receivership of said company, forbade its receivers selling said machinery, and from the entry of such order the latter took this appeal. From the record we gather these facts:

On August 29, 1913, the National Automatic Press Company, a corporation of Pennsylvania, was the owner of the factory site here involved. It had a factory building equipped with machinery adapted to manufacture printing presses, and on August 29, 1913, gave a first mortgage to the Chelton Trust Company, the present appellee, to secure a bond issue of $100,000. The mortgage covered:

"All property, real, personal and mixed, rights, franchises, machines and all lands, tenements, machinery and property of every kind whatsoever of this corporation. *which it now owns* or which *it may hereafter acquire* by purchase or otherwise."

At the date of the mortgage the factory was equipped with machinery to make printing presses, which was its sole business, and it never engaged in the business of a general machine shop, and was not intended for that work. Indeed, as to this equipment the master, as noted hereafter, found "the machinery left [mortgaged] would not be sufficiently diversified for the manufacture of general machinery." Its equipment consisted of lathes, drills, etc., 23 in number, suitable for manufacturing printing presses, and all such equipment now remains on the premises and is now subject to the mortgage. As to them there was and is no dispute, and, save the ordinary wear and tear of subsequent use, these machines, and the factory building in which they are situate, and the land on which the factory stands, constitute the property upon which the mortgage was given, and can now be taken in foreclosure and used as before for manufacturing printing presses. This printing press manufacturing business of the Automatic Company was not successful; it passed into the hands of a receiver appointed by a state court on February 20, 1915, and on October 20, 1915, its land with the factory was sold at judicial sale to E. P. Jennings, Jr. In the absence of statute, this judicial sale would have divested all liens, but under the statute of Pennsylvania, quoted in the margin,[1] the lien of this first mortgage was preserved and the title taken by Jennings was subjected thereto.

It will, of course, be noted that it was then, and has at all times since, been open to the trust company to foreclose its mortgage and enforce to its full extent the lien created when the mortgage was given and

[1] "When the lien of a mortgage upon real estate is or shall be prior to all other liens upon the same property except other mortgages, ground rents, and purchase money due the commonwealth. and except taxes. municipal claims and assessments not at the date of said mortgage duly entered as a lien in the office of the prothonotary of the proper county. and except taxes, municipal claims and assessments. whose lien though afterwards accruing has by law priority given it, the lien of such mortgage shall not be destroyed or in any wise affected by any judicial or other sale whatsoever, except as hereinafter stated, whether such sale be made by virtue or authority of any order or decree of any orphans' or other court, or of any writ of execution or otherwise, howsoever: Provided, that this section shall not apply to cases of mortgages upon unseated lands or sales of the same for taxes. (1901, May 8; P. L. 141, § 1.)" Pa. St. 1920, § 8853.

preserved by the statute. It will also be noted that, with the judicial sale of its property, all relationship of any kind between the Automatic Company and the Chelton Company ended, and the relationship between the latter company and Jennings, the purchaser, was that of lienor and terre-tenant, or the holding of land subject to lien.

On February 24, 1916, Jennings, the purchaser, conveyed the land to the Lehigh Munitions Company, a corporation of Delaware, its name being changed to Lehigh Machine Company. This company temporarily entered into the manufacture of war munitions, and to do so it used, not only the mortgaged machinery, which the Automatic Company had installed to make printing presses, but it also bought, at a cost of $45,000, and set up in the factory, some 112 pieces of machinery, consisting of lathes, milling machines, drill presses, screw machines, universal grinders, and other equipment needed in the manufacture of munitions. These machines were placed on the floor in such a way they could be removed without damage to the factory, and were operated by belts carried from the machines to the line shafting of the factory. They, together with some others added by the company to make silk-working machinery, and some added during the receivership, constitute the machinery here involved.

With the close of the war, the Lehigh Munitions Company ceased manufacturing munitions and took up the manufacture of silk mill machinery, and in doing so continued to use both the mortgaged machinery and the 112 pieces which it, as above stated, had installed in the factory. The master has found that the machinery bought as aforesaid, by the Lehigh Munitions Company, cost $45,000, and its present selling value is from $24,000 to $28,000; that it was "of a character appropriate to the manufacture of munitions and materials, in which the said Munitions Company was engaged"; that "the greater part of the said machinery was set in place on the floor of the said machine shop and kept in operative position by its own weight." The machines were operated by electric power, furnished by a public service corporation. No damage was done to the factory by the installation of this machinery, and its removal would leave the mortgaged premises and the mortgaged machinery in the same condition as they were when the mortgage was given, and when the property was sold; the master's finding being:

"The machinery which the receivers are desirous to remove forms the newest and best part of the machinery in the shop on the mortgaged premises. The shop could still be operated as a going concern without this machinery, but its operative capacity would be reduced about two-thirds, and the machinery left would not be sufficiently diversified for the manufacture of general machinery, and the production of the shop would probably have to be specialized."

The manufacture of silk mill machinery by the Lehigh Munitions Company also proved unprofitable, and that company passed into the hands of receivers. Thereupon the receivers, proposing to move 112 pieces of machinery from the mortgaged factory and place it in a factory building on an adjoining lot, which had been bought by the Lehigh Munitions Company on September 27, 1919, presented a petition to the court below, praying for an order to sell this last-mentioned lot

and the factory thereon, together with the removed 112 pieces of machinery. Whereupon the Chelton Trust Company intervened, averred that the machinery installed by the Lehigh Munitions Company was subject to the lien of its mortgage, and objected to its removal, and the matter was referred to a master, who held:

"It is not material that these machines were acquired and installed by the Lehigh Munitions or Machine Company after it became the owner of the property. Regardless of that circumstance, the machines, upon being so installed, became a part of the realty and subject to the lien of the mortgage, and are now bound thereby."

The report of the master being approved by the court below, this appeal was taken, and the question before us is whether the machinery brought on the premises for trade purposes by the Lehigh Munitions Company, the owner of the fee, was thereby subjected to the lien of a mortgage given by a former owner of the premises. So far as we are advised, no case involving a situation and relation of parties such as here presented, has ever been before the courts of Pennsylvania, and while, in some of the cases, language is used which, it is contended, is decisive of the instant case, examination of them shows that, where used, it had reference to states of facts or situations wholly different from the present.

We may say that no contention is, or indeed could be, made that the lien of the mortgage is by any contractual words used therein, extended to this machinery as after-acquired property, for the lien of mortgage, in that regard, is limited to property which the mortgagor "now owns or which it may hereafter acquire by purchase or otherwise." Turning, then, to the question whether the law extends this lien to machinery which an owner of the property by judicial sale brings on the premises for a trade purpose that was necessarily temporary, we note that, but for the statute quoted in the margin, the lien would have been divested by the judicial sale, and that statute makes no provision for lien expansion but only for subjection to an existing specified lien; its words being that "the lien of such mortgage shall not be destroyed or in any wise affected." Now the expressed purpose of this statute has been observed by the purchaser, the land and machinery mortgaged have been preserved, for the plant can be used to manufacture printing machinery in the same way and in the same quantity as before.

Moreover, since by the judicial sale the Munitions Company became, not a mere occupant of the premises, but the owner of the fee, its relation thenceforth to the lienor was that of terre-tenant (Chahoon v. Hollenback, 16 Serg. & R. [Pa.] 432, 16 Am. Dec. 857), and as such terre-tenant it "must show" (Dengler v. Kiehner, 13 Pa. 38, 53 Am. Dec. 441) "how the lien of it has been discharged, whether by payment, release, or efflux of time." To a foreclosure by the trust company, which will take the land, the factory, and the mortgaged machinery, this terre-tenant can have, and indeed makes, no defense; but on what principle or policy of law can the $45,000 worth of machinery which the terre-tenant placed on the premises for trade purposes, and for trade purposes which the original parties never had in view and

about which they never contracted, be subjected to this mortgage lien? The court below cites no authority, and those cited by the master do not, in our judgment, apply to the facts of the present case. .

Morris' Appeal, 88 Pa. 378, was not a case between a subsequent purchaser at judicial sale and a lien extended by statute, but was between mortgagor and mortgagee. As the master in that case says:

"Here the question, as already said, arises between the original parties to the transaction, and the effect to be given their agreement is not influenced by any considerations which might arise if * * * the rights of third parties had intervened."

And the Supreme Court was equally careful to point out that the rights of subsequent purchasers were not involved, saying:

"The contention here is to be considered solely as between Harry G. Morris, assignor, of the one part, and the appellees of the other part. No rights of subsequent purchasers or of creditors are involved. The main question is whether the parties to the mortgage, at the time of its execution, intended to cover the property now in controversy."

The principle of the case is that the thing mortgaged was a foundry plant, and that whatever was necessary to carrying on that foundry, including articles added to the foundry by the mortgagor, became part of the foundry and subject to the mortgage. In the instant case, what was mortgaged was not a machine shop, but a plant for making printing presses, and one the master has found was not equipped for the manufacture of general machinery; in other words, it was not a machine shop in the sense of being equipped for general work. The printing press plant still remains intact. What was brought on the premises by the new owner was $45,000 worth of machinery, to use in a wholly different business, viz. war munitions. In this case it is said :'

"Physical annexation to realty is not necessary to convert a chattel into a fixture. Whether it be such depends much on the business for which the premises are used. Articles necessary or convenient in the transaction of one kind of business, would be useless in another. If the article, whether fast or loose, be indispensable in carrying on the specific business, it becomes a part of the realty. Voorhis v. Freeman, 2 W. & S. 116; Pyle v. Pennock, Id. 390; Ege v. Kille, 3 Norris, 333."

The case of Muehling v. Muehling, 181 Pa. 490, 37 Atl. 527, 59 Am. St. Rep. 674, was that of the mortgage of a knitting plant and knitting machinery added to the plant by the mortgagor, a wholly different case from ours, where use as a printing press manufactory ended, when the machinery for such a plant remains intact and unimpaired for such use, and the machinery in question was brought on the premises by the terre-tenant for the obviously temporary use of a munition plant.

The case of Bank v. North, 160 Pa. 303, 28 Atl. 694, simply holds that steam radiators, in analogy to gas fixtures, are not part of the realty. Finally, the master cited East Stroudsburg Glass Co. (D. C.) 247 Fed. 616. That case was one between mortgagor and mortgagee. It involved the molds, both hand and machine, used in a glass tank furnace plant when it was mortgaged, and indispensable to the operation of the tank plant. Without these molds the tank plant would cease to be a glass plant, and taking them away meant robbing the mortgagee of the security he took by the mortgage, which was on all "machinery,

plant, tools, equipment  \*  \*  \*  which are *necessary, useful, or convenient for use, maintenance, or operation of its business."*

In our case, the munition and silk machinery added were not indispensable in carrying on the specific (printing press) business which was the plant mortgaged. The true test, however, as in most actions, is one of intent—the intent with which these machines were placed in the building. Of the intent of either party, which is a matter of fact and proof, there is no express proof, so that, if any intent is found, it must be an implied one. We are unable, in the absence of such proof, to infer one on the part of the Munitions Company. The plant, as we have seen, was, when mortgaged, equipped for a special use to wit, for building printing presses. The company failed; there is no proof that the new purchaser ever made any printing presses with the machinery or ever intended to. Indeed, the proof is that, while the machinery is in better shape than it was when the plant of the Automatic Company was sold, printing presses could not be built there with profit. There is therefore no ground for inferring an intent to place the new machines in the printing press factory as an addition to or an improvement of a going plant. On the contrary, the express proof was that they were placed there for the purpose of making munitions, and in the nature of things war materials were but temporary. Later, automatic machines were added for the rapid production of silk machinery, which business the company turned its attention to when the war call for munitions ceased. Not only are all the proofs hostile to the suggestion of an intent to increase the printing machinery plant as such, but the natural sense of equity revolts at the idea that the new company, or the creditors of that company, or the receiver who added some of the machinery, had the purpose that this $45,000 of new machinery was placed there with the intention that it should become part of the printing machinery outfit, and thereby subjected to this mortgage. Indeed, so weighty is this sense of equity that it is apparent that it must prevail, unless the decisions of Pennsylvania compel a contrary intent. But those decisions do not create an intention on the part of the Munitions Company; at most they simply say, if such is the intent of that company, such intent will govern. But no such intent is here proven or chargeable.

We are therefore of opinion the decree below should be reversed.

WOOLLEY, Circuit Judge (dissenting). There is involved in this case no principle of equity. The single question is one of law,—the law of fixtures. While I fully agree that the case is governed, not by the terms of the mortgage with reference to after-acquired property, but by the law of fixtures, just as though the mortgage contained no such clause, I find myself at variance with the majority of the court on both the law and the facts. Therefore, I am constrained to dissent. The first point of difference is on the law.

The law of fixtures as pronounced by the courts of Pennsylvania seems to be settled. The trouble is with its application.

This law, considered with reference to its evolution and the tests afforded for its application, I find substantially as follows:

The old rule of common law made all articles attached to the freehold a part of the realty, without regard to the person who made the attachment or the purpose for which the attachment was made. Carpenter v. Walker, 140 Mass. 416, 5 N. E. 160. The first relaxation in this rule appeared in the doctrine of trade fixtures; the next, in the relation generally between landlord and tenant. The Pennsylvania courts, varying the English rule to meet changing industrial conditions, early regarded as exploded the notion of physical attachment as a requisite quality of a fixture, Meigs' Appeal, 62 Pa. 28, 1 Am. Rep. 372; and laid down certain tests by which to determine when personalty becomes realty. The controlling test, or, as expressed by the courts, the "legal criterion," is the intention with which the personalty is placed upon or attached to the freehold. Hill v. Sewald, 53 Pa. 271, 91 Am. Dec. 209; Seeger v. Pettit, 77 Pa. 437, 18 Am. Rep. 452; Morris' Appeal, 88 Pa. 368; Vail v. Weaver, 132 Pa. 363, 19 Atl. 138, 19 Am. St. Rep. 598; Wickes Brothers v. Island Park, 229 Pa. 400, 78 Atl. 934. This test is not limited to a mutual understanding of both parties, the one owning the personalty and the other the realty, or the one owning the realty and the other having a lien thereon, but extends to the intention of him alone who has attached personalty to realty in such a way as to raise a question of fixtures. There are, of course, some things so essentially a part of the freehold that the intention of the one affixing them to the freehold may be of little weight. Harmony Building Association v. Berger, 99 Pa. 320. So also the intention which becomes controlling is not the—

"secret design which may dwell in a party's mind and as to whose existence he alone can speak, but it is that 'intention' * * * which flows, patent to all, from the nature and character of the act, the clear purpose to be served, the manifest relation which the articles bear to the realty, and the visible consequences of their severance upon the proper and obvious use of it." National Bank of Catasauqua v. North, 160 Pa. 303, 28 Atl. 694.

Discarding the early doctrine that physical annexation to realty is necessary to convert a chattel into a fixture, the courts, in seeking the intention of the party, have found that much depends on the business for which the premises are used. Articles necessary or convenient in the transaction of one kind of business would be useless in another.

"If the article, whether fast or loose, be indispensable in carrying on the specific business it becomes a part of the realty." Voorhis v. Freeman, 2 Watts & S. (Pa.) 116, 137 Am. Dec. 490; Pyle v. Pennock, 2 Watts & S. (Pa.) 390, 37 Am. Dec. 517; Ege v. Kills, 84 Pa. 333; Morris' Appeal, 88 Pa. 383; Sampson v. Graham, 96 Pa. 405.

Applying the law of these authorities to manufactories, federal courts in this circuit (In re Beeg [D. C.] 184 Fed. 522, and In re East Stroudsburg Glass Co. [D. C.] 247 Fed. 614) have held:

That "machinery of a factory, which is a necessary part of it, and without which it would not be a fully equipped establishment, is a fixture to be regarded a part of the freehold, subject to the lien of a mortgagee or judgment creditor as part of the realty"

—quoting with approval from Voorhis v. Freeman, supra, in which Judge Gibson said:

"Whether fast or loose therefore, all the machinery of a manufactory, which is necessary to constitute it, and without which it would not be a manufactory at all, must pass for a part of the freehold."

Quoting from Hubbell v. Savings Bank, 132 Mass. 447, 448, 42 Am. Rep. 446, the Supreme Court of Pennsylvania in Vail v. Weaver, 132 Pa. 363, 365, 19 Atl. 138, 19 Am. St. Rep. 598, approved a charge of the trial court as to the intention of the party making the annexation where these words were used:

"In the case of machinery, or other articles which are not obviously an integral part of the realty, the question is, whether all the facts of the case lead to the *presumption* or *inference* that the *owner*, in placing them in the building, *intended* them as a *permanent improvement of or addition to the realty. If this is a fair presumption or inference*, then a grantee or *mortgagee* would have a right to consider them as constituting a part of the realty, and they would pass to him by his deed."

Keeping in mind that we are dealing solely with a question of fixtures,—not with the liability of a terre-tenant to an antecedent mortgagee, nor with the rights of a purchaser limited by any peculiar feature of a judicial sale, nor with rights forfeited by a mortgagee because of tardiness in issuing execution,—I find in the law of fixtures no authority for the distinction which the court has drawn between personalty attached to realty by a mortgagor owner and personalty attached by a terre-tenant after he has acquired premises encumbered by the lien of a mortgage. Nor do I find anything in the law which indicates that personalty attached to realty by the owner, if used in a definite business, cannot become a fixture because that business is different from the business in which the realty was used when the premises were mortgaged. Or, stated differently, neither do I find that fixtures are limited to the specific business in which the realty was employed at the time the mortgage was given. As the position taken by the court is an approach to the law of trade fixtures, it is important to note that, from the very nature of the transaction, the law of trade fixtures cannot, in any aspect, be involved in the case. This being true, the only test of fixtures which I find in the law (in the absence of an understanding between the parties) is the intention of him who affixed the personalty to the realty, first, without regard to whether he is mortgagor or terre-tenant, but, second, with especial regard to the temporary or permanent character of the annexation.

Applying this test, and this test alone, to the question before the court, I come to the facts. They are in the main as stated in the majority opinion. Yet, as the court has held that the facts do not disclose the intention of the company (under its two titles) in affixing its personalty to its mortgaged realty and that the facts will not sustain any inference as to its intention which may be drawn therefrom, I find it necessary to restate a few of the facts in the light in which they appear to me.

In 1913, Jennings promoted and organized the National Automatic Press Company, a local industry. This company gave the mortgage here in question, covering premises on which a machine shop had been erected. This shop, later known as Shop No. 1, was equipped with

machinery for the manufacture of printing presses. The company went into the hands of a receiver. At a receiver's sale Jennings purchased the realty and machinery, subject to the mortgage. Embarking in a new venture, he conveyed the property (still encumbered by the mortgage) to a new corporation known as Lehigh Munitions Company. This company then purchased a tract of land adjoining the mortgaged tract. On the newly acquired tract (not encumbered by the mortgage) it erected seven buildings including a machine shop which became known as Shop No. 3, all of which, taken together, comprised the company's plant. After acquiring Shop No. 1 with its printing press machinery, the Munitions Company, intending to engage in the manufacture of munitions, added more machinery which, with the machinery already there, equipped the shop for the manufacture of munitions. After the war, the same corporation, under its new title of Lehigh Machine Company, installed still more machinery, which, with the old machinery, equipped it as a machine shop in which silk manufacturing machines were made. In due course this company failed and the plaintiffs in error were appointed receivers. They in turn installed more machinery in the course of their management. Shop No. 1, thus equipped from time to time with different machines installed by different parties to do different work, through a period of seven years, became a "machine shop purely," as the record shows, fully equipped to perform general machine work.

The machinery which the company under its two titles and its receivers installed in the machine shop on the mortgaged premises is not physically attached to the freehold except as it is connected by belts to line shafting put up for the purpose of conveying power. The greater part of the machinery is simply set in place on the floor and is of a kind that is kept in operative position by its own weight; the remaining part is held in place by set screws or clamps; all capable of being removed without injury to the building. Of the machinery now in Shop No. 1 on the mortgaged premises, the receivers desire to remove to Shop No. 3 on the adjoining tract (not covered by the mortgage) all machines which were installed at different times by the company and its receivers, and propose to set them up in Shop No. 3 and sell that shop as a newly organized going concern; and if this cannot be done, then to sell the machines separately, free from the mortgage in either event, leaving Shop No. 1 in its original status with respect to the mortgage and to the machines on which the mortgage was a lien before the same passed under the receivership sale of the Press Company.

The determining consideration on the question of fixtures is whether these facts show an intention on the part of those who installed the machines to place them in the building for temporary use only, or to make them a permanent improvement of or an addition to the realty. Speaking negatively, I find nothing in the record which suggests even remotely an intention to place the machines in the building temporarily. Of the same opinion is the majority of the court. Speaking affirmatively, it is a fair inference that the Munitions Company intended to engage in the munitions business temporarily, but that it did not tem-

282 F.—8

porarily install the machinery adapted to the manufacture of munitions is evidenced by the positive fact that it kept the machines in the building and used them for other purposes after it went out of the munitions business. In the building up of the several businesses, Shop No. 1 was developed into and became distinctly a machine shop adapted at different periods for special work but capable in the last stage of doing general contract machine work. The affirmative inference which, I think, should be drawn—not implied—from these facts is that the company installed the machines with the intention of doing just what it actually did, namely; the building of a complete machine shop. This shop is not the company's whole manufactory. It is but an unit in its plant; yet it is such an unit that its destruction would inevitably work a disorganization of the plant. All the machinery installed was, so far as I am informed, of a character appropriate to the purposes for which the shop was, from time to time, being used and, in the estimation of the company installing it, was essential to the shop (otherwise it would not have been installed) and indispensable in carrying on the business of a machine shop. As the business changed, machines were not taken out. On the contrary, more were put in and all the indications are that it was the company's intention to keep them in. And this is exactly what the company did until the receivership. There is, I think, every evidence that the machines were intended as a permanent addition to the mechanical organization of the shop and so became an integral part of the realty. Although there are many cases in the books where machinery installed in structures and actually affixed to the realty retain its characteristic of movable personalty, this is due to some circumstance showing an evident intention to that end, or that it was not essentially a part of the structure, or was not necessary or adapted to the business to which the structure was devoted, or that its installation was patently temporary. Carpenter v. Walker, 140 Mass. 416, 5 N. E. 160; Wickes Brothers v. Island Park, 229 Pa. 400, 78 Atl. 934; Harmony Building Association v. Berger, 99 Pa. 320; Vail v. Weaver, 132 Pa. 363, 19 Atl. 138, 19 Am. St. Rep. 598. The moving considerations in this case are quite the opposite. Hence, I would hold, under the law which I regard as controlling, that the machines in question are fixtures and being realty are brought under the lien of the mortgage. Roberts v. Bank, 19 Pa. 71; Muehling v. Muehling, 181 Pa. 483, 37 Atl. 527, 59 Am. St. Rep. 674; Morris' Appeal, 88 Pa. 368. As I am alone in this view, I am constrained to dissent from the opinion and judgment of the court.