Pennsylvania Chocolate Company, for use, *v.* Hershey Brothers, Aplnts. (No. 1).

Argued October 4, 1934. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*William G. Bechman,* of *Rose, Bechman & Dunn,* with him *Oliver K. Eaton, Isadore Goldsmith* and *Kaplan & Goldsmith,* for appellants.

*Albert C. Hirsch,* with him *John M. Freeman, Ralph H. Demmler* and *Watson & Freeman,* for appellee.

OPINION BY MR. JUSTICE SCHAFFER, November 26, 1934:

The question here to be determined is whether certain machinery installed in a large manufacturing plant after the creation of a mortgage thereon was covered by its lien. The machinery is claimed by the Commonwealth Trust Company, purchaser of the plant at a sheriff's sale on the bond accompanying the mortgage, and by the receivers of the company which acquired the plant from the mortgagee. The receivers excepted to the sheriff's sale and moved to set it aside, claiming that the machinery is personalty and does not pass to the purchaser. The court decided in favor of the purchaser and the receivers bring this appeal.

Prior to the year 1923, the Pennsylvania Chocolate Company operated a chocolate factory in a seven-story building. Separate therefrom, but connected therewith, was a power house. In the year named, it sold its plant to a corporation now known as the Eatmor Chocolate

Company, of which appellants are receivers, subject to two purchase-money mortgages, the first thereof for $275,000, which was assigned to the appellee, the Commonwealth Trust Company. The mortgage was due in ten years from its date and contained the usual improvements and appurtenance clause. It is conceded by appellants that its lien covered the manufacturing plant and every part thereof, as it existed in 1923.

The Eatmor Chocolate Company prior to 1925 manufactured nothing but chocolate, cocoa, chocolate coatings, chocolate bars and small shapes and chocolate liquors. The machinery and equipment of its plant were not suited for the production of anything else. In that year the company decided to enlarge the scope of its business to include the manufacture and sale of candies and confections. The object of the company in the extension of the business was to increase the profits from the manufacture of chocolate, by creating occasion for a greater production thereof, thereby decreasing the unit cost.

During the years 1925-31, the company purchased and installed a large quantity of machinery and equipment for use in making confections and candies at a total cost of $290,000. This new apparatus was set up principally on certain floors of the factory theretofore vacant, although parts of it were scattered throughout the plant. It was connected with the power lines previously used to operate the chocolate manufactory. Part of the new equipment was adapted to the manufacture of candies only, and could not be used in making chocolate products; other parts were suitable for making chocolate; still other parts were designed and used to manufacture candies and confections containing or coated with chocolate. As a result of manufacturing the new products, the chocolate business was increased nearly fifty per cent. The facilities, machinery and equipment in the plant when the mortgage was created were inadequate to manufacture all of the chocolate required in making the new products and it became necessary to buy additional ma-

chinery and equipment for the production of chocolate. In order to take care of the increased output of the factory, it also became necessary to enlarge the power plant and refrigerating system.

It was found by the court below that, "as the entire plant is now constituted, all of the machinery and equipment which have been installed therein since 1925 are indispensable to operations presently conducted," although, says the opinion, "it seems to be conceded that the machinery used solely to manufacture candies and confections can be removed with only slight injury to the freehold, and that if removed the manufacture of chocolate can be resumed precisely as in 1923." When the receivers were appointed, the production of chocolate, cocoa and chocolate coatings and liquors constituted 75% of the plant's output; candies and confections made up the rest.

Broadly stated, the position of appellants is that the candy and confection business which the company undertook in 1925 was a new and separate business from the chocolate manufacture theretofore carried on, that it was temporary in character, that the additional machinery installed to carry it on was personalty, removable without serious injury to the freehold and not covered by the lien of the mortgage, and that it did not pass by the sheriff's sale. In their brief, appellants state they are not claiming here (they did in the court below) that part of the machinery and equipment placed in the building to enlarge or replace machinery used solely in the manufacture of chocolate, or to replace or enlarge the power plant or refrigeration systems, but are claiming all machinery and equipment placed in the building which were adapted, annexed and used exclusively for the manufacture of confections and candy, and which cannot be used in the manufacture of chocolate, and such other machinery and equipment as were used in the building to repair the candy and confection machinery.

The contentions of appellants are so well answered by the opinion of the learned judge of the court below that we quote and adopt what he has said : "The receivers ask us to find further that the facilities for making candies and confections were installed by defendant merely as a temporary and experimental measure, the officers of the company contemplating the removal of such machinery if the new line of business should not prove successful. The testimony does not justify such finding. What it clearly establishes is that in 1925 the company began to manufacture candies and confections on a very small scale and in somewhat tentative fashion, having in mind at that time that the venture might not prove profitable after a few years' trial, in which case the making of candy and confections could be discontinued and the machinery, used for such purpose, removed from the premises. By 1930, however, it had been demonstrated that the candy business was a desirable adjunct to the chocolate business. Thereupon, in that and the succeeding year, the company decided to manufacture candies and confections in large quantities, and proceeded to acquire and install extensive equipment for such purpose, and to increase the capacity of its chocolate department and power plant. What had been a temporary and experimental venture in 1925 had so proved itself over a period of four or five years that by 1931 it had become a permanent department of the plant. The best proof that the making of candies and confections was no longer in the experimental state in 1930 is that in the latter year and in 1931, nearly one-quarter million dollars were spent in rearranging the existing plant and installing new machinery to manufacture candies and confections on a much grander scale. The experiment of which defendants' witnesses spoke obviously was conducted prior to 1930; thereafter the company definitely committed itself to a permanent program of manufacturing candies and confections, in order to increase its manufacture of chocolate, and therefore enlarged and made over its plant

accordingly. Such installations as were made in 1930 and 1931 were neither temporary nor experimental. A fair deduction from all of the circumstances is that at that time the owner intended they should be permanent, and that such installations as had been made during the experimental years immediately preceding should remain permanently also.

"The receivers also ask us to find that defendants' manufacture of candies and confections was a business entirely separate and distinct from the business of manufacturing chocolate. This we cannot do without disregarding numerous facts which demonstrate the contrary. It may be that in the art itself there is, technically, a recognized distinction between the manufacture of chocolate and the manufacture of candies and confections, and that each requires a process different from the other. But no such distinction exists in the popular mind, for to it a plant is making candy or sweetmeats whether its product be pure chocolate, cream candy, chocolate candy or confections. The Eatmor Chocolate Company, when its mortgage was given, was engaged in making chocolate in various forms and shapes. When, a few years later, it enlarged and expanded its plant, so as to be able to manufacture candy also, its primary purpose was to increase the volume of its chocolate business and thereby reduce the unit cost of manufacture. What it really did was to provide itself with an additional outlet or market for its chocolate products by fabricating them into candies and confections. True, it also made candies and confections in which no chocolate was used, but that was merely incidental to the principal function of the plant; the making of chocolate constituted 75% of the company's business. In adding candies and confections to its line of products there was no wide departure from the business theretofore conducted. The existing plant was merely expanded by adding another department wherein were manufactured, (a) confections, consisting of nuts coated with chocolate, and (b) candies, some of which contained

chocolate and others none. Even though a new process of manufacture was introduced, the general character of the business remained unchanged, namely : the manufacture of sweets for public consumption. Defendant's theory is that the manufacture of candies and confections is a business wholly distinct from the business of making chocolate, and that hence, in commencing to manufacture candies and confections, it engaged in a new and separate enterprise. The best evidence that defendant did not conduct in its plant two distinctly separate businesses is that the entire plant was integrated; the same power, water and refrigerating systems supplied all machinery therein; the same executive and sales forces directed and promoted all operations; the same engineers supervised all manufacturing processes; and the greater portion of the chocolate produced, instead of being sold to the trade, was worked up into the form of candies and confections before being put on the market. In short, the company did not engage in a new business; it merely added a new department to an existing business, thereby necessitating an increased production by the latter. Prior to the installation in question, the plant had been a manufactory, with chocolate as its chief product; after the installation, it was still a manufactory, chocolate was still its principal output and it had merely added to the number and character of its products two closely related commodities, candies and confections. Accordingly we find the fact to be that none of the machinery and equipment installed since 1925 were brought upon the premises in connection with the establishment of a new and separate business. They were installed solely for the purpose of enlarging the production and character of products of an existing business. Having found the fact to be that the machinery and equipment now claimed by defendant to be personalty were in fact made the subject of permanent installation in a manufacturing plant, for the purpose of enlarging and increasing an existing business, and defendant having admitted that all such machinery

is 'necessary for the business that is now being done by the company,' the appropriate legal principle is clear. Chattels placed in an industrial establishment for permanent use, and necessary to the operation of the plant, become fixtures and hence a part of the real estate, regardless of whether they are physically attached thereto: Titus v. Poland Coal Co., 275 Pa. 431. If, when the mortgage was given, the parties contemplated it should cover an operating plant (and that is the situation here), the fact that machinery was placed in the plant after the mortgage was given, has no effect upon the lien of the mortgage; if the machinery and appliances are necessary to the functioning of a complete plant, they are fixtures and bound by the lien of the mortgage: Com. Tr. Co. v. Harkins, 312 Pa. 402. The fact that the additional equipment in this case was installed long after the mortgage was given did not prevent its becoming additional security for the benefit of the mortgagee. As was said many years ago in Roberts v. Dauphin Bank, 19 Pa. 71, 'As the mortgagee may suffer by the depreciation of the property, arising from fluctuations in value, from accident and from neglect, so he may be benefited by its appreciation, whether the same arises from the proper cultivation and improvement of the property, or from any other cause. No other rule could be at all practical.' In support of their contention that the items now in question continue to be personal property, the receivers rely upon the case of Vail v. Weaver, 132 Pa. 363. But the reason for holding in that case that a lighting plant was a chattel and not part of the realty was that it had been installed for a purely temporary use, that is, to supply light to a temporary occupant of another property, and not to permanently improve the premises on which it was erected. Since in the case at bar we have found the installation was a permanent addition to an existing plant, the authority of Vail v. Weaver is inapplicable, as is also McConnell v. Chelton Trust Co., 282 Fed. 105, for the same reason.

"We summarize our findings by stating that a considerable part of defendant's new installation was to insure increased productivity of the existing plant, while the remainder was chiefly for the purpose of permitting such increased production to be fabricated into new but closely related products. There was such interrelationship and interdependence between the new facilities and the old, both physically and functionally, that together they constituted only an enlargement of the plant as it originally existed. The size, cost and purposes of the improvements, following a minor experimentation for three or four years, demonstrate beyond question that the installation was designed and intended as a permanent enlargement and betterment of defendant's manufactory. Under these circumstances our long established rules of property determine that the articles, when installed, at once became fixtures and passed under the lien of plaintiff's mortgage." See Bullock Elec. Mfg. Co. v. Lehigh Valley Traction Co., 231 Pa. 129.

We accordingly hold that the various articles involved in this proceeding are the property of the Commonwealth Trust Company, purchaser at the sheriff's sale, and the order of the court below as to them is affirmed at appellants' cost.