**General Electric Credit Corporation v. Pennsylvania Bank and Trust Company**

*David P. Truax,* for plaintiff.
*John V. Pepicelli,* for defendant.

THOMAS, P. J., March 24, 1972.—The matter is before the court on stipulation of facts for nonjury adjudication. The issues were framed around conflicting claims of creditors arising under sheriff's interpleader proceedings: Rule 3201, et seq. Two separate and distinct factual situations and legal postures are involved.

## FACTS
### *The 1964 Conditional Sales Contract*

We deem it unnecessary to copy herein verbatim the lengthy stipulation of facts agreed to by the parties but, in the event of an appeal, the said stipulation will be deemed to be incorporated into this opinion by reference and will become a part hereof as an addendum.

A summary of the facts necessary to resolve the first issue may be stated as follows:

The Pennsylvania Bank and Trust Company (formerly Merchants Bank and Trust Company) took a regular mortgage from Herbert L. Partridge on April 17, 1962, in the amount of $15,000, covering 80 acres in Hayfield Township, Crawford County. On May 1, 1964, Partridge entered into a conditional sales contract with William H. Field Company, Inc. This contract covered log turning equipment, saw, rolls and conveyors necessary for a sawmill operation in a sawmill on the mortgaged premises. The sales contract was in excess of $48,000. A financing statement was executed and filed in the recorder's and prothonotary's offices on June 20, 1964, and in Harrisburg on June 22, 1964.

On October 15, 1964, the bank executed a "Consent to Installation—Realty Owner's and Mortgagee's Waiver" for the personal property covered by the conditional sales contract and the pertinent language of this waiver is as follows:

"(The Bank does) hereby agree that the property described in the Contract may be affixed to the above real estate and that said property is to remain personal property notwithstanding the manner in which it is affixed to the said real estate and that title thereof shall remain in the Seller (i.e., Field Co.), his—successors—

or assigns until all amounts due under the Contract have been paid to him . . . and I hereby waive each and every right which I now have or may hereafter have under the laws of the State of Pennsylvania. . . ."

On October 27, 1964, Field assigned the conditional sales contract to General Electric Credit Corporation who financed the transaction.

On December 1, 1964, 46 days after the bank had executed the above "Mortgagee's Waiver," the bank "refinanced" Partridge's mortgage and took a new mortgage in the amount of $46,000 and made it an "assembled manufacturing plant mortgage" and inserted the following language in the new mortgage:

"It is specifically intended by the parties hereto that the premises herein mortgaged be considered as an assembled manufacturing plant, even if the law of Pennsylvania would construe it to be otherwise, and that in the event of default, or foreclosure, or the occurrence of any other event that may render the mortgagee insecure, the assembled manufacturing plant doctrine of Pennsylvania shall apply in favor of the mortgagee within.

"It is the intention of the parties, therefore, that the saw mill located upon the premises, in addition to the residence, and all outbuildings and structures of whatever nature, including all equipment, tools, parts, supplies and inventory, whether attached or unattached to the real estate, be considered part of the assembled manufacturing plant on the premises, which said plant is engaged in the manufacture and production of finished lumber from raw material.

"It is further intended by the parties that all buildings, structures, mills, equipment, tools, parts and supplies and all chattels upon the premises constituting the assembled plant and necessary to the operation thereof, be and they are considered not only part of

the assembled plant and the premises, but are to be considered covered under this mortgage, and that this mortgage is to cover in addition all after acquired chattels that may become part of the assembled plant in the future."

The "old" 1962 mortgage was satisfied a few days later on December 7, 1964.

Another conditional sales contract came into the picture in 1966 but this is not relevant to the first issue to be decided and will be explored in detail later.

On October 31, 1969, the bank confessed judgment on the bond accompanying its mortgage and the sheriff levied on the real estate and the chattels now "owned" by General Electric Credit Corporation by virtue of assignment of the 1964 conditional sales contract. General Electric Credit Corporation filed interpleader proceedings with the sheriff, claiming title and ownership of the chattels in the sawmill, and the sheriff, pursuant to rule 3204, filed a determination of prima facie ownership in favor of General Electric Credit Corporation. The bank filed objections to the sheriff's determination.

The stipulated balance due on General Electric Credit Corporation's contract was $7,386.70. The sheriff sold the property and, by agreement of the parties, the net sales proceeds were held in escrow and the matter submitted to the court on a stipulation of facts for nonjury determination.

### Issue No. 1

Does General Electric Credit Corporation or Pennsylvania Bank and Trust Company have priority as to the equipment covered by the 1964 conditional sales contract?

### DISCUSSION

The bank claims a priority over General Electric

Credit Corporation to the chattels, actually the proceeds therefrom, on two grounds. The first, because the original 1962 mortgage as to which the bank gave its "Mortgagee's Waiver" was satisfied and since said "Waiver" was given by the Bank *as mortgagee only under the 1962 mortgage,* it terminated when the 1962 mortgage was satisfied *and* these chattels were then "picked up" or included as fixtures under the 1964 "assembled manufacturing plant mortgage." If this argument fails, the bank then claims that even though General Electric Credit Corporation had perfected its security interest by proper filing on June 20, 1964, under section 9-403 of the Uniform Commercial Code, 12A PS §9-403, this filing "protected" General Electric Credit Corporation for only five years, as provided in section 403(2), unless a continuation statement had been filed by General Electric Credit Corporation six months before the expiration of the five-year period as mandated by section 9-403(3). Since no continuation statement was filed until December 8, 1969, about 10 months late and *after* the sheriff had made the levy, the effectiveness of the filed financing statement lapsed and General Electric Credit Corporation's security interest became imperfected.

General Electric Credit Corporation's posture is that its rights to the chattels were created by the October 15, 1964, waiver executed by the bank and the original filing of the financing statement on June 20, 1964, and the failure to file a timely continuation statement is not determinative of the priority rights inter se between the bank and General Electric Credit Corporation. General Electric Credit Corporation rests its claim on section 9-316 of the code, which provides:

"Nothing in this Article prevents subordination by agreement by any person entitled to priority."

The comment under this section notes:

"This section is intended to make it entirely clear that a person entitled to priority may effectively agree to subordinate his claim."

We conclude that priority insofar as chattels covered by the 1964 contract, must be awarded to General Electric Credit Corporation.

We reject the bank's unique argument that the waiver signed by the bank was valid only so long as the bank remained a mortgagee *under the 1962 mortgage* and when they then became a mortgagee 46 days later under the 1964 mortgage, that their subordination commitment unilaterally terminated.

The bank argues that if XYZ bank had taken the new 1964 "refinancing" mortgage instead of the Pennsylvania Bank and Trust Company, said waiver (subordination) agreement would not be binding on XYZ bank. We need not here decide or discuss this interesting argument because this factual situation is not before us. We are satisfied that when the bank agreed that "title thereof (i.e., to the chattels) shall remain in the Seller. . . until all amounts due under the contract have been paid to him," that this obligation bound the bank under any subsequent refinanced or new mortgages with Partridge covering substantially the same real estate and fixtures. It would be illogical, inequitable and unjust to permit the bank, while wearing its "1962 mortgagee hat," to agree they had no interest in $48,000 worth of fixtures located on the mortgaged real estate, and then 46 days later take a new mortgage on the same real estate and fixtures while wearing its "1964 mortgagee hat" and then claim its subordination agreement had been abrogated because it had conveniently switched mortgaging hats.

We agree with General Electric Credit Corporation's argument that section 9-316 (Priority Subject to Subordination) is controlling of the 1964 contract situa-

tion and renders compliance with section 9-312 (Priorities Among Conflicting Security Interests in Same Collateral) superfluous insofar as the rights between General Electric Credit Corporation and the bank are concerned.

We conclude, therefore, that General Electric Credit Corporation is entitled to preference in payment over the bank as to the proceeds held in escrow relating to the chattels financed under the 1964 contract. The parties have stipulated as to how we allocate proceeds, and we will make an appropriate award under their stipulated formula later in this opinion.

## FACTS

### The 1966 Conditional Sales Contract

We turn next to a summary of the additional facts necessary to resolve the second priority problem between the parties.[1]

Apparently the sawmill operation required additional internal equipment and on June 9, 1966, Partridge purchased edgers, trimmers and related equipment in the amount of $20,150 from Field Company under a conditional sales contract. There is some confusion of dates, as Partridge signed this contract June 9, 1966. Both parties signed a certificate of delivery and installation certifying complete installation on July 25, 1966. However, the Field Company apparently did not get around to dating, or perhaps both signing and dating, the original contract until July 29, 1966. Field Company assigned the contract to General Electric Credit Corporation on July 29, 1966. On August 3, 1966, a financing statement was recorded in the prothonotary's office, recorder's office and the office of the Secretary of the Commonwealth at Harrisburg.

---

[1] See stipulation of facts for full details of transactions summarized herein.

It should again be noted that *prior* to the signing and filing of this 1966 conditional sales contract, the bank had placed an "assembled industrial plant mortgage" on the realty and sawmill on December 1, 1964, which specifically covered after-acquired chattels. See language, supra.

As previously noted, Partridge defaulted in payments, the bank confessed judgment on October 31, 1969, levy was made by the sheriff on the fixtures covered by the 1966 contract, the same were sold and the proceeds now held in escrow. There was an unpaid balance due on this contract of $8.944.80.

## Issue No. 2

Does General Electric Credit Corporation or Pennsylvania Bank and Trust Company have priority as to the equipment covered by the 1966 conditional sales contract?

The bank takes the position that this issue resolves itself down to the basic question of whether the security interest of General Electric *attached* to the chattels sold under the 1966 contract before the equipment became affixed to the realty.

## DISCUSSION

Both parties agree that the proper interpretation of section 9-313, 12A PS§9-313, should resolve the priorities between the parties.

The bank claims priority on two theories: First, the bank claims that in order for General Electric Credit Corporation's security interest to attach to the chattels, the three requirements of section 9-204(1) must be met[2] and, second, there also must be a *perfection* of the security interest by a filing of a financing

---

[2] These three requirements are: (1) An agreement a security interest attach; (2) value given; (3) the debtor has rights in the collateral.

statement *before* the chattels become affixed to the realty. If this posture of the bank is not controlling, the bank then takes the following position:

(a) Section 9-313(2) provides that a security interest which attaches to goods *before they become fixtures* takes priority as to the goods over the claims of all persons who have an interest in the real estate, except as noted in subsection 4.

(b) Section 9-204(1) provides a security interest cannot attach until there is an agreement . . . that it attach and value is given and the debtor has rights in the collateral.

(c) Although Partridge signed the conditional sales contract June 9, 1966, and although the equipment was delivered and installed in the mill July 25, 1966, the Field Company did not sign the contract until July 29, 1966.

(d) Therefore, no security interest could have attached to the chattels *before* they were affixed to the real estate since there was no "agreement," (section 9-204(1)), between the parties till four days *after* the parties mutually acknowledged the chattels had been delivered and installed, i.e., by signing the certificate of delivery and installation on July 25, 1966.

We would have been happier if testimony on this peculiar date sequence could have been produced rather than presented to the court as a stipulation, but, in all probability, a lapse of six years would have dulled memories or produced testimony shaded by exigencies of the moment.

Under General Definitions and Principles of Interpretation of the Code, we find in section 1-201(3), the following:

(3) "Agreement" means the bargain of the parties in fact as found in their language or by implication

from other circumstances including course of dealing or usage of trade or course of performance . . ."

It is neither logical, practical, trade practice nor common sense to conclude that because somehow Field Company dated the agreement after they acknowledged $3,000 as being paid to them and after they shipped, delivered and installed the equipment in Partridge's mill, that no contract or agreement existed between the parties until four days after the above was accomplished. Perhaps, through inadvertance or oversight, the contract was not dated by Field Company until it was ready to assign to General Electric Credit Corporation on the same date of July 29, 1966.

We need not speculate as to how or why this post facto date appears, as we are satisfied from the exhibits and a reasonable application of section 1-201(3) that there was an agreement between the parties that Field have a security interest in the goods, that value was given and that Field Company had rights in the collateral in accord with the mandates of section 9-204(1).

We conclude then that General Electric Credit Corporation had a security interest in the goods which attached before they became fixtures attached to the sawmill.

Having thus concluded, we must then turn to section 9-313 to determine the priority of security interests in these fixtures.

The pertinent parts of section 9-313 essential for determination of this issue are as follows:

"(1) . . .

"The law of this state other than this Act determines whether and when other goods become fixtures. This Act does not prevent creation of an encumbrance upon fixtures or real estate pursuant to the law applicable to real estate.

"(2) A security interest which attaches to goods before they become fixtures takes priority as to the goods over the claims of all persons who have an interest in the real estate except as stated in subsection (4).

"(3) . . .

"(4) The security interests described in subsections (2) and (3) do not take priority over

"(a) a subsequent purchaser for value of any interest in the real estate; or

"(b) a creditor with a lien on the real estate subsequently obtained by judicial proceedings; or

"(c) a creditor with a prior encumbrance of record on the real estate to the extent that he makes subsequent advances"

The code comments note:

"3. Where a security interest in the goods as chattels has attached before affixation, subsection (2) gives the secured party priority over all prior claims based on an interest in the realty. If the secured party perfects his interest by filing, which he may do in advance of affixation, he takes priority over subsequent realty claims as well. So long as he fails to perfect his interest he may, however, be subordinated to the subsequent claimants described in subsections (4) (a), (b) and (c)."

We thus see that insofar as chattels that are *newly added* to the real estate are concerned, the debtor whose security interest "attached" prior to their affixation is entitled to priority in the fixtures over all persons having an interest in the real estate, i.e., the bank via its previously recorded mortgage, subject to the limited exceptions of subsection 4, which the parties admit are not applicable here.[3]

---

[3] See Major Revisions in Article 9, Pa. Bar Quarterly, Vol. 31, no. 3, March 1960, pp. 269 and 270.

Having concluded that the security interest attached before affixation, we reject the bank's argument that General Electric Credit Corporation lost its priority by failure to perfect its interest by filing a financing statement *before* the goods attached and became fixtures. Had there been a security interest created in fixtures *already on the premises,* then under the mandate of section 9-313(3), the bank's mortgage would have given it priority over General Electric Credit Corporation, but such is not the case.

The extent to which the age-old Pennsylvania "Industrial Plant Mortgage Doctrine" has survived the code is not readily ascertainable by reading section 9-313, or the code comments. The Supreme Court conveniently sidestepped the issue in Karp Bros., Inc. v. West Ward Savings & Loan Association of Shamokin, 440 Pa. 583, 271 A. 2d 493 (1970), when they said:

"We make no decision as to the status of the Assembled Industrial Plant Doctrine' as far as the present appeal in concerned, either as to its applicability to the facts or in light of the enactment of the Commercial Code."

While Karp, supra, is not exactly analogous to our case, it certainly strengthens our analysis of section 9-313. In Karp, the owners of a motel (McCown) placed a mortgage thereon to West Ward Savings & Loan. Apparently this was a "standard" mortgage and whether or not the assembled industrial plant doctrine was applicable to the mortgage is not decided; supra. Subsequent to the mortgage, McCown bought restaurant equipment on a bailment lease from Karp. Neither the lower nor appellate court ever made a finding as to whether the restaurant goods became part of the realty, as this decision was said to be unnecessary in the disposition of the case. But the Supreme Court then says:

"Even if we assume that the goods did, in fact, become affixed to the realty, nevertheless, Karp does have a priority interest in the goods under the Act of April 6, 1953, as amended by the Act of October 2, 1959, §9-313.

"Under U.C.C. §9-313(2): 'A security interest which attaches to goods before they become fixtures takes priority as to the goods over the claims of all persons who have an interest in the real estate except as stated in subsection (4).' The only category listed in subsection (4) in which West Ward could hope to be included is that of a 'subsequent purchaser for value of any interest in the real estate,' U.C.C. §9-313(4). However, subsection (4) makes clear that 'an encumbrancer purchasing at his own foreclosure sale' (such as West Ward herein) is not deemed to be a 'subsequent purchaser' within the meaning of Section 9-313. U.C.C. §9-313(4).

"Thus, if Karp had a 'security interest' and that interest 'attached' before the goods became fixtures, its interest takes priority."

The brief of the bank argues that Karp stands for the proposition that the the security interest creditor must comply with the "attaching" mandates of section 9-204(a) and, in addition, *must file a financing statement before the goods* are affixed. We do not so read this opinion or the code.

Perfecting the interest by filing of a financing statement may have some bearing on priorities inter se between the secured party and subsequent creditors, but under section 9-313, a chattel interest can take priority over an existing realty interest providing the security interest *attaches before* affixation.

In an interesting article, "The Effect of the Uniform Commercial Code on the Pennsylvania Industrial Plant Doctrine," U. of Pitts. L. R. Vol. 16, No. 2, Winter

1955, p. 89, et seq., we note the following comments relative to attaching, filing and priority:

"Where a security interest in plant machinery and equipment attaches before affixation, and the secured party perfects his interest by filing in accordance with Sections 9-401 and 9-402 of the Code (which he may do in advance of affixation), the secured party takes priority over all realty claims. Suppose, for example, that a plant owner borrows money to purchase new rolling mill equipment and the bank files the financing statement before the rolling mill equipment is installed in the plant, the bank would prevail over a plant mortgagee, regardless of whether the plant mortgage was executed before or after the security agreement.

"On the other hand, filing is not always a prerequisite to priority of the chattel security interest holder over the industrial mortgagee. A secured party whose security interest in the chattel has attached before affixation need not perfect his interest by filing in order to attain priority over *prior* claims based on an interest in realty. Thus an unperfected security agreement covering elevators to be installed in an office building would prevail over a prior mortgage on the building and all equipment to be installed therein. This is contra to the old Pennsylvania view as expounded by the court in the *Pennsylvania Chocolate* case." See Pa. Chocolate Company v. Hershey Brothers, 316 Pa. 292, 175 Atl. 694 (1934).

"If, however, the secured party whose security interest has attached before affixation neglects to perfect his interest by filing, his interest will be subordinated to the subsequent claimants described in subsections 1(a), (b), and (c) of Section 9-313.": subsections 4(a), (b), and (c) under the 1959 amendment to section 9-313.

The authors then conclude:

"The Industrial plant doctrine will undoubtedly be applied by Pennsylvania courts in determining what goods are properly part of the realty rather than personalty. Consequently, where the machinery and equipment which are to be installed in a plant are necessary for the operation of the plant, Section 9-313 will determine the relative priority of the chattel security interest and the realty interest." [Footnotes omitted.]

Even though the bank's mortgage specifically provided that the mortgage was "to cover in addition all after-acquired chattels that may become part of the assembled plant in the future," the bank and the secured party, General Electric Credit Corporation, must derive their respective priorities from section 9-313 of the code. While the industrial plant morggage doctrine may not have been eliminated by the code, the legislature chose to limit the priorities of "all persons who have an interest in the real estate" to the strict mandates of section 9-313. Had they desired to give added protection to mortgagees holding "assembled industrial plant mortgages" with after-acquired property clauses therein, they have had over 17 years to make the necessary amendments to do so. Having chosen not to do so, we refuse to read into this section of the code a legislative mandate subordinating the rights of creditors holding a security interest in fixtures to the rights of an existing mortgagee who attempts to "over secure" himself by an "after-acquired" clause in the mortgage.

We conclude that General Electric Credit Corporation has a priority as to the 1966 conditional sales contract. Stipulation No. 5 provides that in the event General Electric Credit Corporation is awarded priority under both the 1964 and 1966 conditional sales

contracts, the entire $19,000 held in escrow shall be awarded to General Electric Credit Corporation.

Accordingly, we make the following

## ORDER

And now, March 24, 1972, the decision of the Sheriff of Crawford County is sustained and a verdict is rendered in favor of plaintiff, General Electric Credit Corporation, and against the Pennsylvania Bank and Trust Company (formerly Merchants National Bank and Trust Company), defendant. Plaintiff is entitled to receive from the Sheriff of Crawford County from escrow funds specially held, the sum of $19,000, plus any earned interest thereon.

An exception is noted for defendant, Pennsylvania Bank and Trust Company.

